**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

In re:                                          :          Chapter 13

Kevin Clark,                                     :

            Debtor.          :          Bankruptcy No. 21-13326-MDC

# MEMORANDUM

## I.    INTRODUCTION

Pending before the Court for disposition is the motion of Sayed Y. Shah ("Mr. Shah") for relief from the automatic stay (the "Stay Relief Motion"),[1] imposed by §362(a) of the United States Bankruptcy Code, 11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code"), so that he may pursue eviction of the debtor, Kevin Clark ("Debtor" and together with Mr. Shah, the "Parties"), from property located at 2434 Rosewood Trail, Linfield, Pennsylvania, a/k/a 2434 Rosewood Trail, Royersford, Pennsylvania (the "Property"). Mr. Shah asserts the Debtor leases the Property from him under a now-terminated month-to-month lease. The Debtor objects (the "Objection")[2] to the Stay Relief Motion on the basis that he is not simply a tenant of the Property under a month-to-month lease, but rather has a property interest in it under a rent-to-own agreement. For the reasons set forth herein, the Court will deny the Stay Relief Motion.

## II.    RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

The Debtor filed a voluntary chapter 13 bankruptcy petition on December 17, 2021.[3] He filed a proposed plan (the "Initial Plan") and his bankruptcy schedules (the "Initial Schedules")

---

[1] Bankr. Docket No. 24.

[2] Bankr. Docket No. 29.

[3] Bankr. Docket No. 1.

and statement of financial affairs on January 2, 2022.[4]  The Debtor did not list the Property in

Part 1 of his Initial Schedule A/B, and answered "No" to the question whether he owns or has

any legal or equitable interest in any residence, building, land, or similar property.  He likewise

did not claim an exemption for the property in his Initial Schedule C.  Nor did the Debtor list Mr.

Shah in his Initial Schedule D as having a secured claim, or his Initial Schedule F as having an

unsecured claim.  The Debtor did not identify any executory contracts or unexpired leases in his

Initial Schedule G.

On March 25, 2022, Mr. Shah filed the Stay Relief Motion.  Mr. Shah asserts that he is

the owner of the Property, and that on or about April 8, 2020, he and the Debtor entered into a

residential lease for the Property.  The Stay Relief Motion asserts that the Debtor failed to make

the required lease payments for February and March 2022, in the amount of $3,850 each, and

that the lease expired on February 20, 2022.  The Stay Relief Motion asserts that the Debtor

remains at the Property but has failed to provide adequate protection of Mr. Shah's interest in the

Property by paying rent, which will result in irreparable injury to Mr. Shah.  Mr. Shah alleges

that stay relief will not adversely affect the Debtor's bankruptcy estate "as the Lease adds no

value to the estate."

Attached to the Stay Relief Motion as Exhibit B is what Mr. Shah asserts is the lease with

the Debtor (the "Motion Lease").  Both Mr. Shah's and the Debtor's names are purportedly

handwritten in the Motion Lease, although the Debtor's name is spelled "Kavin Clarks" both in

the prefatory paragraph and below his signature line.  The Motion Lease is undated, and provides

for monthly lease payments of $3,500, due in advance on the first day of each month, with the

---

[4] Bankr. Docket Nos. 11, 13.

Debtor considered to be in breach and subject to eviction if the lease payment is not made by the tenth of the month.  Handwritten in the "Additional Terms and Conditions" section of the Motion Lease is a provision for annual 10% increases in rent, and "if Tenant will not pay rent on time Lease will be terminated."  The Motion Lease provides for a security deposit of $10,000 (the "Security Deposit").  It provides that Mr. Shah is responsible for utilities and services, including electricity, telephone service, cable television, heat, water, garbage pick-up, snow removal, and lawn maintenance.

The Debtor filed his Objection to the Stay Relief Motion on April 14, 2022.  He asserts that he did not sign the Motion Lease, but rather that Mr. Shah forged it.  The Debtor asserts that he occupied the Property subject to a rent-to-own agreement, pursuant to which he paid Mr. Shah $15,000 as a down payment and pays above-market rent towards the purchase price.  He further asserts that Mr. Shah refuses to accept payments from him or from a third-party agency through a rental assistance grant.  In addition to opposing Mr. Shah's request for stay relief, the Debtor requests an accounting of the equity portion he has paid pursuant to the purported rent-to-own agreement.

On June 22, 2022, the Debtor filed an amended plan,[5] and on June 28, 2022 filed a second amended plan (the "Second Amended Plan")[6] as well as an amended Schedule A/B (the "Amended Schedule A/B") and an amended Schedule C ("Amended Schedule C").[7]  The Debtor's Amended Schedule A/B lists the Debtor's asserted equity in the Property, in the amount of $34,950.00, subject to a rent-to-own ownership interest.  The Debtor's Amended Schedule C

---

[5] Bankr. Docket No. 47.

[6] Bankr. Docket No. 53.

[7] Bankr. Docket No. 54.

claims an exemption for the Property in the amount of $25,150.00 pursuant to §522(d)(1) of the

Bankruptcy Code and $1,244.00 pursuant to §522(d)(5).

The Court held an evidentiary hearing (the "Hearing") on the Stay Relief Motion on

September 9, 2022, and took the matter under advisement subject to the Parties' submission of

post-Hearing briefs (the "Briefs").  Mr. Shah submitted his Brief ("Movant's Brief") on October

18, 2022,[8] and the Debtor submitted his Brief ("Debtor's Brief") on November 4, 2022.[9]

## III.    DISCUSSION

### A.    Testimony and Evidence at the Hearing[10]

At the Hearing, the Court heard testimony from Mr. Shah, his wife Sofia Yahya ("Ms.

Yahya"), and the Debtor regarding the relationship and history between the Debtor and Mr.

Shah, the Parties' positions regarding their agreement with respect to the Property, and the

Parties' course of performance after the Debtor moved into the Property in April 2020.  The

Debtor's testimony was wide-ranging, and Mr. Shah and Ms. Yahya's testimony touched on

some, but not all, of the areas the Debtor covered.  The Court therefore organizes its summary of

their testimony by topic covered, rather than by witness or the order in which it was presented at

the Hearing.

The Court also heard limited testimony from Andrew Monastra ("Mr. Monastra"), who is

---

[8] Bankr. Docket No. 79.

[9] Bankr. Docket No. 88.

[10] Because the Court believes that resolution of this matter hinges on the credibility of the Parties, it summarizes the testimony at the Hearing in detail.  The Court's summary is based on its review of the Hearing recording, the Hearing Transcript at Bankr. Docket No. 80, and the documents that were admitted into evidence at the Hearing.  In an effort to make the summary more readable, however, the Court has omitted repeated pinpoint citations to the Hearing Transcript, instead including them only when directly quoting testimony or where the Court otherwise believes them to be helpful to the reader.

Mr. Shah's counsel in eviction proceedings against the Debtor, and Joseph Coppola ("Mr. Coppola"), a realtor who testified on behalf of Mr. Shah regarding the estimated value of the Property.

      1.      **Testimony of the Debtor, Mr. Shah, and Ms. Yahya**

            a.      **The Parties' Relationship and Initiation of Discussions Regarding the Property**

The Debtor testified on direct that he had known Mr. Shah for at least 22 years, and characterized his relationship with Mr. Shah as being very close. The Debtor had previously rented the Property from Mr. Shah, but was evicted in or about 2008. According to the Debtor, however, even after Mr. Shah evicted him the two remained friends.

At some point after evicting the Debtor, Mr. Shah moved back into the Property. The Debtor testified that sometime after March 2018, Mr. Shah expressed to the Debtor a desire to move out of the Property. The Debtor was living with his family in Deptford, New Jersey at that time, but asked Mr. Shah whether he would be willing to lease the Property to the Debtor with an option to buy. Mr. Shah did not give him an answer until sometime in the first half of 2019, when he advised the Debtor that he had found another home he was interested in acquiring, and in that event, he would be willing to give the Debtor a rent-to-own agreement.

            b.      **The Debtor's Payments to Mr. Shah Prior to Moving Into the Property**

The Debtor testified in detail about the point at which he alleges Mr. Shah took a deposit for the Property, in June 2019. According to the Debtor, Mr. Shah was putting flooring down in the basement of a property in Phoenixville, Pennsylvania, and needed the Debtor's assistance in

removing a refrigerator.[11]  Mr. Shah asked the Debtor to bring his rented box truck to the site to

load and remove the refrigerator, and also asked the Debtor to bring a deposit for the Property.

The Debtor testified that he brought Mr. Shah a $4,000 cashier's check and $1,000 in cash, but

Mr. Shah asked him to cash the cashier's check and give him the $5,000 entirely in cash.[12]  The

Debtor stated that Mr. Shah did not give him a receipt for the deposit, but did state that he would

speak with Ms. Yahya and draw up a lease.  When asked whether there was any discussion of the

purchase price for the Property, the Debtor testified that in the days prior to this exchange, he

and Mr. Shah had a conversation about the Property, at which point Mr. Shah had said that the

fair market value of the Property was approximately $540,000, so that would be the price at

which Mr. Shah could sell it.[13]

 The Debtor testified that he and his family did not move into the Property after he

provided the deposit because, soon thereafter, Ms. Yahya had a medical emergency from which

she would need time to recover, prompting Mr. Shah to ask the Debtor to delay moving forward

with the Property for approximately a year.  The Debtor agreed and extended his lease for the

New Jersey home for another year.

 Mr. Shah had a drastically different explanation of the $4,000 payment.  According to

Mr. Shah, after the Debtor was previously evicted from the Property and found liable for

---

[11] The Debtor testified that he and Mr. Shah had to cut the refrigerator apart with a saw to get it out of the basement.  Hearing Transcript, 125:19 to 125:25.

[12] Exhibit D-4 is a copy of a June 8, 2019 cashier's check from TD Bank, made out to Mr. Shah, in the amount of $4,000.00.

[13] See Hearing Transcript, 126:25 to 127:6 ("I think he said, I'm almost, I'm not really sure, but it was between that conversation and the conversation that we had prior to that, maybe a day or two ago, he was saying that fair market value was like 540 because I asked him, you know, what would be the, you know, asking price at that point and he said, Kev, 540 is probably what I can do it for and that was the end of the conversation.").

$8,167.05 in unpaid rent,[14] he and the Debtor agreed to settle that judgment liability for payment of $7,000, with $4,000 paid in 2019, and the $3,000 balance paid in 2020.  Mr. Shah characterized the $4,000 check received from the Debtor in June 2019 as partial payment of his judgment liability to Mr. Shah, and denied also having received $1,000 in cash.

The Debtor challenged Mr. Shah's testimony that he had agreed to pay $7,000 in satisfaction of the judgment prior to leasing the Property.   According to the Debtor, he and Mr. Shah did not have any conversations about the judgment liability, and the Hearing was the first time Mr. Shah asserted that.  He did, however, admit that he gave Mr. Shah an additional $3,000 after providing the $5,000 cash deposit for the Property, but could not recall why he had done so.[15]

**c.  The Parties' Discussion Regarding the Terms of Their Agreement**

The Debtor testified that in or about February 2020, Mr. Shah called the Debtor to advise that he had found a new home to purchase and asked whether the Debtor was ready to move forward with leasing the Property.  The Debtor stated that the Parties discussed the terms of the rent-to-own agreement at that point, agreeing on a five-year lease with an option to purchase the Property.   The initial monthly rent was to be $3,500.  The Debtor was to provide an additional $10,000,[16] for a total deposit of $15,000, and $950 of the monthly rent was to be applied to the

---

[14] See Exhibit M-3.  Mr. Shah testified that this occurred in 2008, but Exhibit M-3 is the docket in the action and reflects that it was initiated and the judgment entered in 2010.

[15] On re-direct, Mr. Shah asserted that the $3,000 balance was paid in "March or something," which is why the lease was not signed until April 2020. Hearing Transcript, 83:9 to 83:22.

[16] See Exhibit D-6 is a copy of a February 1, 2020 cashier's check from TD Bank, made out to Mr. Shah, in the amount of $10,000.00.  It is unclear from the Debtor's testimony whether he had already given this check to Mr. Shah when they allegedly discussed the specific terms of the rent-to-own agreement.

purchase price of the Property.  On cross-examination, the Debtor testified that the rent-to-own

agreement with Mr. Shah contemplated that during the five-year lease term, the Debtor would

attempt to improve his credit and Mr. Shah would assist the Debtor and his wife in obtaining a

mortgage to purchase the Property.

The Debtor testified that none of these terms were reduced to writing in February 2020.

Furthermore, the Debtor testified that he and his family did not move into the Property at that

time because Mr. Shah's new home was not ready, so he had asked the Debtor to delay moving

until April 1, though they ultimately were not able to move into the Property until late April.

Mr. Shah, by contrast, testified that at no time prior to renting the Property to the Debtor

or during the Debtor's tenancy did they discuss a rent-to-own arrangement.  Mr. Shah asserted

that the $10,000 received from the Debtor was not a down payment.  Rather, he required the

Security Deposit of $10,000 from the Debtor because the Debtor had previously been evicted

from the Property.[17]  On cross-examination, Mr. Shah testified that although the Debtor provided

him $10,000 as the Security Deposit on or about February 1, 2020, the Parties did not sign a

lease on that date because the Debtor still owed the $3,000 required to satisfy the negotiated

judgment liability.

### d.      The April 2020 Execution of an Agreement Between the Parties

The Debtor stated that in mid-April, prior to moving in to the Property, he told Mr. Shah

that he needed the terms of their agreement in writing.  Because Mr. Shah advised that he did not

have any leases to prepare, the Debtor purchased form leases and brought them to Mr. Shah's

---

[17] Mr. Shah admitted that he has not returned any portion of the Security Deposit, but holds it in an
interest-bearing account.

home.  At that time, according to the Debtor, Mr. Shah "wrote everything up, the conditions of the lease, he put the 15K on there, he put the option, he put all of that on there and we signed the lease … He wrote the five years.  He put, you know, the six occupants, he put with the option to buy, he put $950 going toward the purchase.  And then the lease I signed at his house, it was not a ten percent increase, it was five percent.  And that was basically the terms."[18]  The Debtor asserted that under the lease he signed, the first month's rent of $3,500 was to be deducted from the $15,000 deposit, leaving a deposit balance of $11,500.

Mr. Shah, on the other hand, asserted that the Debtor signed the month-to-month Motion Lease in Mr. Shah's and Ms. Yahya's presence at their home, not a rent-to-own lease.[19]  Ms. Yahya likewise testified that Mr. Shah and the Debtor signed the Motion Lease at her home, and that she was not aware of any rent-to-own agreement between the Parties.

### e.    The Debtor's Need to Prove Residency to the School District

The Debtor testified that he did not leave Mr. Shah's home with a lease because he did not have a photocopier at the home, and Mr. Shah advised he could not make a copy that day.  The Debtor was therefore to return that weekend to obtain his copy.  The Debtor alleges, however, that he was not able to obtain a copy over the ensuing ten months despite multiple requests made to Mr. Shah.  The Debtor's failure to have a written lease, however, created problems with his children's school district after he moved to the Property.  The Debtor testified that he received multiple communications and requests from the school district regarding the need for him to provide proof of residence within the district, which needed to be established by

---

[18] Hearing Transcript, 135:15 to 136:7.

[19] See Exhibit M-1.

a lease, deed, settlement sheet or property tax bill.  The Debtor testified that after each of these requests, he called or texted Mr. Shah or Ms. Yahya to tell them that the school district was looking for a copy of the lease.

The repeated requests from the school district culminated in school police visiting the Property in March 2021.  The Debtor testified that he was driving his trucking route at the time the police visited the Property, but upon receiving a call from his wife, he immediately called Mr. Shah to advise that the police were at his door requiring proof of residence and he needed the lease.  The Debtor alleges that Mr. Shah instructed him to go to Mr. Shah's home, where Ms. Yahya would provide him with the lease.  Upon his arrival, he testified, Ms. Yahya handed him a folder through the partially opened front door in an abrupt manner, and because under the circumstances he was in a rush to produce proof of residence to the school district, he did not look at the contents of the folder.  The Debtor testified on cross-examination that upon being handed the folder with what he believed was his rent-to-own agreement, he did not review it before submitting it to the school district because he was emotionally upset with the circumstances under which Mr. Shah and Ms. Yahya had provided it to him after a year of waiting.  Rather, the Debtor said, he took it directly to the school office and left it with a receptionist.

Mr. Shah testified that the Motion Lease is the lease the Debtor presented to his children's school district to verify their residence.  On cross-examination, however, Mr. Shah was shown a second, different copy of the lease between the Debtor and Mr. Shah for the Property, also dated April 8, 2020 (the "Alternate Lease").[20]  Mr. Shah acknowledged that all

---

[20] Exhibit D-12.

fillable blanks in the Alternate Lease appeared to be in Ms. Yahya's handwriting, but Mr. Shah

wrote his name below his signature line.  Mr. Shah testified that he only signed one lease with

the Debtor,[21] and questioned whether the Alternate Lease was a photocopy of the Motion Lease.

When confronted with clear differences in the handwritten sections of the two leases, however,[22]

Mr. Shah acknowledged that there were two different documents.[23]  He subsequently asserted

that at some point after the Parties signed the lease for the Property on April 8, 2020, the Debtor

needed the lease to establish residence with the school district, at which time the Debtor came to

Mr. Shah's home, signed another copy of the lease, and took it with him to provide to the school

district.[24]

Ms. Yahya's testimony regarding the lease-signing differs from her husband's.  Ms.

Yahya testified that that there was not only one lease signed at her home in April 2020.  Rather,

she said that she downloaded two copies of the lease, completed both, and gave one copy to the

Debtor and kept one copy.  According to Ms. Yahya, however, both documents were signed at

the same time on the same day, in her presence at her home.  When asked about the Alternate

Lease, Ms. Yahya stated that she did not have a photocopier at her home at the time, so she

printed two copies of the downloaded form lease and handwrote all information in each.  She

testified that both Mr. Shah and the Debtor signed both leases, and therefore their signatures may

---

[21] Hearing Transcript, 73:14 to 73:18 ("Q: Would it be fair to say that you prepared one month to month lease?  A: We signed only one lease with him.  Q: Okay.  A: One lease, one time.  That's it.").

[22] These differences appear in the two leases' "Additional Terms and Conditions" section, Mr. Shah's signature, and the Debtor's printed name below his signature.

[23] Mr. Shah's acknowledgment was as follows: "No, there is two leases.  I got you.  This look like this two times just different things. Yeah, I agree.  Look like that is two different pieces.  You know, you don't need to go on that detail."  Hearing Transcript, 76:2 to 76:5.

[24] *See* Hearing Transcript, 81:13 to 82:9.

not appear exactly the same on both.  Ms. Yahya asserted that after the two copies of the lease

were signed, she gave one to the Debtor with the key to the Property, but at no point after April

2020 did she give the Debtor another lease to provide to the school district.

> **f.**     **The Parties' Contentions Regarding the Authenticity of the Motion Lease and Alternative Lease**

The Debtor asserted that the first time he saw the Motion Lease was when it was

produced in discovery by Mr. Shah's counsel, and the first time he saw the Alternate Lease was

upon obtaining it from the school district.[25]  The Debtor denied signing either one, and testified

that the signature on each is different.  He further denied having given Ms. Yahya a misspelled

version of his name to put on a lease, asserting he would have never done so.  He also denied

having printed his own misspelled name below his purported signature.  The Debtor asserted that

the only term of his rent-to-own agreement with Mr. Shah reflected in the two leases was the

initial monthly rent of $3,500.  Moreover, the Debtor testified, he never would have entered into

a month-to-month lease for the Property given that he has four children and would be moving

from New Jersey.  Nor would he have agreed to such a large security deposit for a month-to-

month lease.  The Debtor testified that the only reason he returned to lease the Property was

because he had the option to buy it, on which his wife conditioned her agreement to move from

New Jersey.[26]

---

[25] The Debtor testified that he obtained the Alternate Lease from the school district after Mr. Shah instituted eviction proceedings and he was advised by his counsel in those proceedings that he needed a copy of the lease.  It was then, the Debtor asserted, that he learned that he had given the school district a month-to-month lease he had not previously seen or signed.  Hearing Transcript, 169:13 to 170:9.

[26] The Debtor testified that he had been living with his wife and children in a rented three-bedroom townhome for which he was paying $2,175 per month.  He further testified that his home in New Jersey was in a good school district.

With respect to the Motion Lease, Mr. Shah testified on cross-examination that Ms.

Yahya handwrote all fillable blanks, other than where Mr. Shah's name is printed below his

signature line.  This included the sections that misspelled the Debtor's name as "Kavin Clarks"

rather than Kevin Clark, but Mr. Shah asserted that the Debtor gave Ms. Yahya that misspelling.

On cross-examination Ms. Yahya confirmed that the handwriting in the fillable blanks of the

Motion Lease was hers, including the "Additional Terms and Conditions" section and the

Debtor's printed-but-misspelled name below his signature line.  Like Mr. Shah, Ms. Yahya

testified that the Debtor gave her the misspelling of his name, which she showed to him and he

confirmed.  In contradiction to Mr. Shah's testimony, however, Ms. Yahya testified that Mr.

Shah's printed name below his signature line was her handwriting.

> **g.    The Parties' Course of Performance with Respect to the
> Debtor's Lease and Occupancy of the Property**

With respect to his rent payments, the Debtor testified that from April 2020 through

December 2021, he made all rent payments.[27]  In January 2022, however, he did not make his

rent payment on time, which he attributed to his trucking business slowing down and his wife

losing her employment after contracting COVID.  As a result, the Debtor paid the January rent in

three installments on January 29th, February 1st, and February 11th.[28]  Ms. Yahya confirmed

during her testimony that the Debtor defaulted on the January 2022 rent payment, but

---

[27] On cross-examination, the Debtor asserted that the increased rent of $3,850 he paid after April 4, 2021 exceeded the 5% increase he agreed to under the rent-to-own agreement, but that he didn't realize it had increased by 10% until receiving discovery from Mr. Shah's counsel.  The Debtor attributed this failure to his seventh-grade education and trusting his friendship with Mr. Shah.  Hearing Transcript, 179:9 to 179:13 ("Q: Isn't that – doesn't that make it an increase to 3,850? A: Again, I got a 7th grade education.  I wasn't doing the math, I was trusting my friend.  If he said, Kev, you did well for the first year, now the rent increased to $3,850, I never questioned it.").

[28] The three installment payments total $4,100, but the Debtor did not explain why that amount was paid, rather than $3,850.

subsequently paid it in three installments in February 2022 by the Cash app.

The Debtor testified that he then attempted to pay the February rent by check, but advised Mr. Shah not to cash the check immediately because it was drawn on a new account that would have insufficient funds until his deposits into the account cleared after two days. According to the Debtor, however, Mr. Shah refused to wait and attempted to cash the check nonetheless. The Debtor stated that he then offered to pay February's rent to Mr. Shah in cash the next day, but Mr. Shah refused the offer. Although the Debtor did not specify exactly when, he testified that subsequent to Mr. Shah attempting to cash the check, he understood that a third-party agency named Family Services of Norristown reached out to Mr. Shah to offer him three months' rent on behalf of the Debtor, but Mr. Shah again refused.[29]

Mr. Shah testified that the Debtor made rent payments by check or by payment through an online Cash app, but never by cash. When shown the Debtor's payment history that Mr. Shah himself prepared in connection with the Stay Relief Motion, however, he acknowledged that the Debtor did make a number of rent payments in cash.[30] Ms. Yahya also acknowledged that the Debtor made some rent payments in cash, some by the Cash app, and some by check, but that he was not given receipts when making the payments. Mr. Shah agreed that from May 2020 through April 2021, during which time the Debtor was responsible for monthly rent of $3,500, there were no missed rent payments. Likewise, from May 2021 through December 2021, during which time monthly rent had increased to $3,850, there were no missed rent payments. Once

---

[29] Ms. Yahya asserted that after paying January 2022 rent, the Debtor had not made any further payments, resulting in a default as of the Hearing in the amount of $30,800 ($3,850 per month for February through September 2022).

[30] See Exhibit D-32, reflecting that the Debtor paid the following months' rent in cash: April 2020 (15 days), June 2020 to October 2020, and March 2021.

January 2022 rent became overdue, Mr. Shah agreed that he rejected an offer from a third-party agency to pay three months' rent on behalf of the Debtor, and instead pursued eviction.

The Debtor also testified regarding various expenses he incurred with respect to the Property. His testimony regarding the payment of utilities was consistent with Mr. Shah's and Ms. Yahya's, *i.e.,* other than trash removal, he paid all utilities. He also testified, however, that he had paid between $2,500 and $3,000 to remove trees at the Property, but only after discussing it with Mr. Shah, who told him removal was his responsibility. The Debtor testified with respect to the average monthly costs he incurred with respect to landscaping at the Property. The Debtor further testified that each time he raised the issue of trees in the yard needing to be taken down, Mr. Shah responded that it was the Debtor's house and his responsibility. Likewise, according to the Debtor, Mr. Shah's position was that the Debtor was responsible for paying homeowner association dues because the Property was his house. The Debtor asserted that he paid that bill in April 2020 when he moved in, and again three months later.[31] The Debtor stated that after Mr. Shah received court papers for unpaid association dues, he "flipped" because the Debtor was not paying them. The Debtor also testified that when the failed air conditioner at the Property needed to be repaired or replaced, Mr. Shah told him that the Property was his house, and the air conditioner was his responsibility.[32]

Mr. Shah, by contrast, asserted that he paid for insurance and all homeowner association dues for the Property other than one month, which the Debtor paid but for which Mr. Shah did

---

[31] The Debtor testified that he did not receive a coupon book for subsequent dues so believed they had been paid for the year. Hearing Transcript, 160:1 to 160:11.

[32] On cross-examination, the Debtor asserted that although he and Mr. Shah agreed to split the $3,000 cost of repairing the air conditioner, Mr. Shah instead drew on the $11,500 balance of the Debtor's Security Deposit. Hearing Transcript, 174:14 to 175:4.

not reimburse him.  Ms. Yahya also testified that they paid the homeowners association dues,

with the exception of one, which the Debtor paid due to Mr. Shah and Ms. Yahya being away.

Mr. Shah agreed that although he was responsible under the Motion Lease for all utilities, he did

not pay for them.  Ms. Yahya confirmed that although both versions of the lease require the

landlord to pay all utilities, Mr. Shah did not pay any other than garbage collection, which was

included in the homeowner association dues.  With respect to the other costs of leasing the

Property, Mr. Shah asserted that, under the terms of the Motion Lease, the Debtor was

responsible for maintenance of and repairs to the Property, but insisted that Mr. Shah split the

cost of replacing the failed air conditioner.[33]

### h.    The Debtor's Failure to Account for the Rent-to-Own Agreement in His Bankruptcy Schedules

The Debtor testified that when he filed his chapter 13 bankruptcy petition in December

2021, he did not list the rent-to-own agreement in his Initial Schedules because he was current on

the lease payments, and did not default until January 2022's rent was due.  The Debtor denied on

cross-examination that he only amended his bankruptcy schedules in June 2022, to include the

rent-to-own agreement and an exemption in his purported equity in the Property, in response to

the Stay Relief Motion; rather, he testified, he did not feel until that time that he "was in danger

of losing [his] home."[34]

### 2.    Mr. Monastra's Testimony

Mr. Monastra's testimony was brief.  He represented Mr. Shah in a post-petition eviction

---

[33] Mr. Shah further asserted that the Debtor painted the Property and deck without Mr. Shah's permission, in violation of the Motion Lease.  The Debtor asserted that this was necessary due to damage to the walls caused by Mr. Shah, and that he paid approximately $10,000 to re-paint them.

[34] Hearing Transcript, 176:1 to 176:5.

action against the Debtor in March 2022.[35]  He testified that during the course of that litigation,

the Debtor did not assert the existence of a rent-to-own agreement and did not assert that the

lease for the Property was forged.  On cross-examination, however, he did not deny that the

Motion Lease was not attached to the notice to vacate that was served on the Debtor at the

Property.

### 3.    Mr. Coppola's Testimony

Mr. Coppola is a realtor who was qualified as and testified as an expert regarding the

estimated value of the Property.  Based on a survey of five comparable properties in relative

proximity to the Property that were sold within the six months preceding the Hearing, Mr.

Coppola estimated the Property's value to be between $800,000 and $850,000.[36]  On cross-

examination Mr. Coppola acknowledged that his valuation report did not analyze value based on

comparable properties as of April 2020.  He also agreed that 2020 values would have been less

than in 2022, and that the COVID pandemic resulted in unexpected property value increases

during that time.[37]

### B.    The Parties' Arguments

### 1.    Mr. Shah's Argument

Mr. Shah argues that the Court should abstain from ruling on "Movant's Landlord Tenant

---

[35] As noted above, Mr. Shah was not listed in the Debtor's Initial Schedules, and the Debtor has not asserted that Mr. Shah willfully violated the automatic stay by the evictions proceeding.

[36] See also Exhibit M-6.

[37] When asked if he had any idea how much the Property was worth in 2020, Mr. Coppola responded that he "wouldn't want to say . . . to shoot off the hip, no, I wouldn't want to say."  Hearing Transcript, 92:21 to 93:3.  He did "not necessarily" agree, however, that it was worth less than $700,000.  Id. at 93:4 to 93:6.

action." Movant's Brief, at 12.[38] Setting forth a 12-factor test courts use when deciding whether

to exercise permissive abstention over matters for which they otherwise have jurisdiction, *id.* at

11 (citing cases), Mr. Shah asserts that nine of the factors are arguably satisfied here. *Id.* at 14.

Mr. Shah argues that there would be no adverse effect on administration of the Debtor's

estate if the state court is allowed to rule in the eviction action, particularly because the Debtor

did not list an interest in the Property in his Initial Schedules. *Id.* at 12. The eviction action is

governed by the Pennsylvania Landlord Tenant Act of 1951, and therefore state law

predominates over bankruptcy issues. *Id.* While the Pennsylvania law may not be difficult or

unsettled, Mr. Shah posits that permissive abstention may still be appropriate to permit a

specialized forum to hear the dispute. *Id.* Mr. Shah also argues that the eviction action is a

related proceeding in state court, filed post-petition but without knowledge of the Debtor's

bankruptcy because neither the Property nor Mr. Shah were listed in the Initial Schedules. *Id.*

Rather than this Court's jurisdiction under 28 U.S.C. §1334, the state court has original

jurisdiction over that related proceeding under 42 Pa.C.S. §1515(a)(2). *Id.* at 12-13. With

respect to whether the eviction action is related to or remote from the Debtor's bankruptcy case,

Mr. Shah argues that the Debtor's failure to include a leasehold interest or a rent-to-own

agreement in his Initial Schedules is "telling," which the Court understands to mean that Mr.

Shah argues there is little connection between the eviction action and bankruptcy case. Finally,

Mr. Shah argues that this is not a core proceeding because the "proceeding between Movant and

Debtor can, and in fact does, exist outside of this bankruptcy [in state court]," and it would not

---

[38] Mr. Shah uses the term "Movant's Landlord Tenant action" without ever defining it or explaining what
he means by it. The Court presumes Mr. Shah to mean the state court eviction action for which he seeks
stay relief to pursue.

"be difficult to sever the landlord/tenant litigation from the core matters in this bankruptcy." *Id.*
at 13.

On the merits of the Stay Relief Motion, Mr. Shah argues that cause exists to grant relief
from the stay to allow him to pursue the eviction action against the Debtor.   Mr. Shah asserts
that the Debtor's claim of a rent-to-own agreement "suddenly materialized from nowhere in the
midst of his bankruptcy" after the Stay Relief Motion was filed, suggesting an "attempt by
Debtor to manufacture property of the bankruptcy estate." *Id.* at 8.  The Debtor's explanation of
why he omitted the purported rent-to-own agreement from his Initial Schedules fails, Mr. Shah
argues, because even if he was not delinquent under the agreement he still was obligated to
disclose any ownership right he had in the Property. *Id.*  Mr. Shah further argues that the Debtor
produced no credible evidence suggesting that such an agreement exists. *Id.* at 9.  There is no
written document, as required for an enforceable agreement for the sale of real estate under the
Pennsylvania Statute of Frauds. *Id.* at 9.  Rather, Mr. Shah argues, the Debtor attempts to prove
the existence of such an agreement through the behavior of the Parties, including Mr. Shah
leaving to the Debtor some of the typical responsibilities and expenses of a property owner, such
as property maintenance and landscaping. *Id.*  But while the Debtor testified regarding his
incurrence of such expenses, he did not present any written proof. *Id.*  Moreover, Mr. Shah
argues, his payment of utilities such as electric, phone, and cable are simply aspects of a normal
tenancy. *Id.*

With respect to the Debtor's assertion that the Motion Lease and the Alternate Lease are
both forgeries, Mr. Shah responds that there is "significant evidence that proves otherwise," but
even if both are deemed unenforceable, the Debtor is still a tenant under a month-to-month lease

by operation of law. *Id.* at 10. Citing *Mercer County Agriculture Soc. v. Barnhardt,* 459 A.2d 811, 814 (Pa. Super. Ct. 1983), Mr. Shah argues that when a tenant has no written lease, they are considered a tenant at will, and the tenancy is month-to-month.

### 2.    The Debtor's Argument[39]

The Debtor first argues that the Court should not exercise permissive abstention because the Court must first resolve whether there was a rent-to-own agreement between the Parties in order to know whether the agreement and the Property are property of the bankruptcy estate, over which this Court has exclusive jurisdiction. Debtor's Brief, at §II.A. If the Court finds that a rent-to-own agreement was reached, the state court eviction action is improper and cannot go forward. *Id.* The Debtor argues that even if the Court determines the Parties entered into a lease, however, it was unexpired and the Debtor had a possessory interest in it as of the filing of the bankruptcy petition, thereby still conferring jurisdiction on the Court. *Id.* Finally, the Debtor argues, the determination of whether the agreement between the Parties is a rent-to-own agreement or a traditional lease is "related to" the Debtor's bankruptcy case because it will have an effect on the case, and therefore this Court has jurisdiction to and should hear it. *Id.*

Turning to whether an enforceable rent-to-own agreement exists, the Debtor argues that the Parties had an oral agreement that was subsequently reduced to writing, but then withheld from the Debtor by Mr. Shah and ultimately replaced with a forged month-to-month lease. *Id.* at §II.D. As such, the Debtor cannot produce the written agreement, but he argues that

---

[39] The Debtor's Brief includes not just legal arguments in support of the Debtor's opposition to the Stay Relief Motion, but also what can only be characterized as testimony from the Debtor's counsel regarding her own experience in other cases or her presumptions of what constitutes expected behavior or beliefs. See Debtor's Brief, at §§II.B, II.D. This is improper, and the Court disregards entirely the sections of the Debtor's Brief containing such testimony. Counsel is advised not to present such testimony, cloaked as argument, in future pleadings submitted to the Court.

Pennsylvania's Statute of Frauds cannot be used as a sword by Mr. Shah to commit fraud. *Id.*

Moreover, the Debtor asserts, pursuant to Federal Rules of Evidence 1002 and 1004, the contents

of the lost rent-to-own agreement can be proven by secondary evidence if the original agreement

has been lost or destroyed, for reasons other than the Debtor's bad faith. *Id.* The Debtor asserts

he presented credible testimony that he did not receive a copy of the signed rent-to-own

agreement from Mr. Shah and Ms. Yahya in April 2020, and that the inconsistencies between,

and not credible character of, Mr. Shah's and Ms. Yahya's testimony establish that they withheld

that lease and later forged the month-to-month lease and provided it to the Debtor while he was

under duress from the school district. *Id.* The Debtor argues that his own testimony regarding

the terms of the rent-to-own agreement, as well as his payment of utilities and improvements to

the Property, provides the necessary secondary evidence of the rent-to-own agreement. *Id.* The

Debtor also argues that Mr. Shah's own lack of credibility provides secondary evidence, pointing

specifically to Mr. Shah's assertion that the Debtor agreed to pay him $7,000 in satisfaction of

the judgment Mr. Shah obtained, when the judgment was discharged in his 2012 bankruptcy case

and/or expired under applicable bankruptcy law prior to the events at issue here. *Id.* In contrast,

the Debtor argues, he presented credible and detailed testimony regarding the circumstances of

the $5,000 payment he made in June 2019 as a partial down payment under the rent-to-own

agreement, providing further secondary evidence of its existence. *Id.*[40]

The Debtor argues that Mr. Shah misplaces his focus on the Debtor's failure to list the

---

[40] The Debtor also argues, presumably in the alternative, that, notwithstanding the requirements of the
Statute of Frauds, the Parties had an oral rent-to-own agreement with respect to the Property under which
both Parties performed, and the Debtor seeks specific performance of that oral agreement, or
alternatively, monetary damages for the $15,000 deposit, the improvement to the Property for which he
paid, and/or the utilities for which he was not responsible but paid and/or the above-market rent ($950) he
paid monthly. *Id.*

rent-to-own agreement or his equity in the Property on his Initial Schedules and the six-month

delay in filing the Amended Schedules.  *Id.* at §II.B.  The Debtor reiterates his testimony at the

Hearing that he did not believe he needed to list the agreement because he was not delinquent in

his payments when he filed his Initial Schedules.  *Id.*  Furthermore, he argues, he has the right to

amend his schedules at any time prior to the close of his case absent bad faith and prejudice to

creditors, and there is no evidence he was attempting to conceal his interest in the Property or

that any creditors, including Mr. Shah, were prejudiced by the amendment.  *Id.*

With respect to the Mr. Shah's request for relief from the stay to continue the eviction

proceeding, the Debtor argues that no cause for such relief exists.  *Id.* at §II.F.  The Debtor points

to Mr. Shah's refusal to accept rent after January 2022.  This self-harm does not render Mr.

Shah's interest in the Property inadequately protected (and in fact Mr. Shah holds the Security

Deposit balance of $11,150).  Moreover, the Debtor asserts, he has a possessory interest in the

Property, it is necessary for his effective reorganization of his debts, and he has equity in the

Property.

### C.    The Court Will Not Abstain Under 28 U.S.C. §1334(c)

Mr. Shah argues that abstention is appropriate because this is a landlord-tenant dispute

that must be resolved by the state court in the eviction action.  As an initial matter, while the

Court believes it useful to articulate why it will not exercise permissive abstention under the

applicable standard, it first observes that Mr. Shah fully tried the issue of whether there is a rent-

to-own agreement before raising the argument in Movant's Brief that the Court should abstain

from resolving it.  While the Court will refrain from summarily finding Mr. Shah's abstention

argument waived, it notes that any right a party has to ask a court to abstain under 28 U.S.C.

§1334(c) can be waived by waiting too long to bring a motion. *See Stehrenberger v. Stehrenberger (In re Stehrenberger),* 2023 Bankr. LEXIS 1089, at *5 (Bankr. Ct. Idaho Apr. 20, 2023) (citing §1334(c)(2)'s "timely" motion requirement and finding the plaintiff's abstention argument waived).

The Court's authority to exercise permissive abstention is set forth in 28 U.S.C. §1334(c), which provides that, with the exception of cases under chapter 15 of the Bankruptcy Code, nothing prevents a district court (and by extension a bankruptcy court) from "in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." A decision with respect to permissive abstention falls within the discretion of the Court. *Allen v. J.K. Harris & Co.,* 2005 WL 2902497, at *1 (E.D. Pa. Nov. 2, 2005). Furthermore, "there is only a narrow sphere of cases in which discretionary abstention should be granted under §1334(c)(1), *e.g.,* when the matter to be decided raises complex issues of unsettled state law, the matter involves issues of unique state interest, there is a parallel state-court action pending, or the matter involves principally claims of non-debtors." *In re U.S. Physicians, Inc.,* 2000 WL 1140294, at *2 (Bankr. E.D. Pa. Aug. 9, 2000).

With these guidelines in mind, as Mr. Shah points out in Movant's Brief, a non-exclusive list of factors is used in this district to evaluate whether abstention is appropriate:

(1)     the effect on the efficient administration of the bankruptcy estate;

(2)     the extent to which state law issues predominate over bankruptcy issues;

(3)     the difficulty or unsettled nature of the applicable law;

(4)     the presence of related non-bankruptcy proceedings;

-23-

(5)      the basis of the bankruptcy court's jurisdiction over the claim;

(6)      the degree of relatedness or remoteness of the proceeding to the main
bankruptcy case;

(7)      the substance rather than form of an asserted "core" proceeding;

(8)      the feasibility of severing state law claims from core bankruptcy matters to
allow judgments to be entered in state court with enforcement left to the
bankruptcy court;

(9)      the burden on the bankruptcy court's docket;

(10)     the likelihood that the commencement of the claim in bankruptcy court
involves forum shopping;

(11)     the existence of the right to a jury trial; and

(12)     the presence in the proceeding of non-debtor parties.

*See, e.g., In re Best,* 417 B.R. 259, 274 (Bankr. E.D. Pa. 2009).  The factors are to be applied

flexibly, with no one factor being determinative, as their relevance and importance will vary with

the particular circumstances of the case.  *Id.*  However, it is also important not to engage in a

mere mathematical exercise of weighting all factors equally, and factors including the effect on

the estate's administration, whether state law issues predominate, and whether the proceeding is

core or non-core are more substantial than some of the other factors.  *In re Kessler,* 430 B.R.

155, 166 (Bankr. M.D. Pa. 2010).

As discussed *supra,* Mr. Shah argues that abstention is appropriate because this is a

landlord-tenant dispute.  That both mischaracterizes and oversimplifies what is at stake here.

The issue before this Court is whether stay relief should be granted to permit Mr. Shah to

proceed with eviction proceedings.  That is the relief that Mr. Shah himself has requested of this

Court.  The Debtor has raised a defense to that requested relief, arguing that the Parties have a

rent-to-own agreement pursuant to which the Debtor can and has offered to cure any default.

This Court's determination of whether stay relief is appropriate is therefore contingent first on a

determination of whether there is a rent-to-own agreement, and if so, whether the Debtor can

cure any existing default.  If that is the case, the Court will not grant Mr. Shah relief from stay to

proceed with eviction proceedings, nor will the Court grant Mr. Shah relief from stay to ask a

state court to determine whether there is a rent-to-own agreement, as Mr. Shah has already tried

that issue before this Court.  Moreover, if the Debtor has a rent-to-own agreement with Mr. Shah,

that agreement and the rights thereunder are estate property, as is any ownership interest the

Debtor may have.  As such, the issue before the Court is not a simple landlord-tenant dispute that

needs to be resolved by a state court; rather, it is fundamental to the Debtor's bankruptcy case.

Its outcome will heavily influence the administration of the Debtor's estate, which is an

enumerated core proceeding under §157(b)(2)(A) of the Bankruptcy Code.  11 U.S.C.

§157(b)(2)(A).  Bankruptcy courts have held that where the outcome of a case may affect the

entire bankruptcy case, permissive abstention is not proper.  *Allen v. J.K. Harris & Co., LLC,*

331 B.R. 634, 645 (E.D. Pa. 2005).

Given the centrality of this dispute to the administration of the Debtor's estate, including

the scope of the bankruptcy estate's property, the Court will not abstain from determining the

nature of the agreement between the Debtor and Mr. Shah.  Resolution of that issue is a

prerequisite to determining whether Mr. Shah can and should be granted relief from stay to

proceed with the state court eviction proceeding.

**D.**    **Cause Does Not Exist to Grant Mr. Shah Relief from Stay Because the Parties Have an Enforceable Rent-to-Own Agreement for the Property**

**1.**    **The Pennsylvania Statute of Frauds Does Not Necessarily Preclude a**

**Finding That There Is an Enforceable Rent-to-Own Agreement
Between the Parties**

The Court first addresses Mr. Shah's argument that the Pennsylvania Statute of Frauds

precludes the Debtor's assertion that there was an enforceable rent-to-own agreement.  The

Pennsylvania Statute of Frauds, codified at 33 P.S. §1, provides generally that all conveyances of

an interest in land shall be in writing.  The statute's writing requirement, however, is not

absolute:

> The statute of frauds is a traditional principle of contract law that
> maintains that modifications to interests in land must be in writing.  This
> particular section of the Statute of Frauds relating to interests in land
> constitutes a statement of public policy.  *It does not render oral
> agreements void.*  The Statute of Frauds is meant to be used as a shield,
> not as a sword.  Said another way, the purpose of the statute of frauds is
> not to prevent the performance of the enforcement of oral contracts that
> have in fact been made; it is not to create a loophole of escape for
> dishonest repudiators.

*Bayer v. CitiMortgage, Inc.,* 2014 WL 4187556, at *4 (M.D. Pa. Aug. 22, 2014) (internal

citations and quotations omitted) (emphasis added).  As the Pennsylvania Supreme Court

recognized in *Simplex Precast Indus., Inc. v. Biehl,* 149 A.2d 121, 123 (Pa. 1959),

"[o]ccasionally, however, an embattled property owner or prospective purchaser of land

summons the statute to enforce a condition which does not seem to coincide with

principles of honesty and fair dealing.  In such cases the Courts should study the situation

involved to make certain that the statute is not being used to perpetrate fraud and

perjuries rather than prevent them."

Consistent with the understanding that situations can exist where an agreement respecting

the conveyance of land is enforceable even if not made in writing, an agreement may be taken

out of the purview of the statute of frauds if: (1) there is evidence to establish the agreement was

-26-

made; (2) it is admitted by the party against whom enforcement is sought; or (3) there has been performance or part performance. *Lisa v. Saxon Mortgage Servs., Inc.,* 2016 WL 5930846, at *22 n.13 (E.D. Pa. Oct. 11, 2016) (quoting *Bayer,* 2014 WL 4187556, at *4). Evidence demonstrating that an agreement was made must be clear and competent, and it may be proven by the acts and declarations of the parties, either together or separately. *Id.* These exceptions promote "the underlying purposes of the statute of frauds: to prevent perjury and fraud ... and to prevent parties from escaping their legal obligations." *Bayer,* 2014 WL 4187556, at *4 (citing *Steelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.,* 63 F.3d 1267, 1276 (3d Cir. 1995)).

The question for this Court, therefore, is whether, notwithstanding that the Debtor has not produced a written document establishing a rent-to-own agreement, there is clear and competent evidence that such an agreement was made. The Court turns then to its analysis of the evidence at the Hearing.

### 2.    The Evidence at the Hearing Establishes That the Parties Entered Into an Enforceable Rent-to-Own Agreement for the Property That Should be Excepted from the Statute of Frauds' Writing Requirement

As the Court advised the Parties upon the close of the record at the Hearing, resolution of this matter "[is] going to boil down to credibility."[41] After consideration of all the evidence at the Hearing, and the credibility of the Debtor, on the one hand, and Mr. Shah and Ms. Yahya, on the other, the Court reaches the conclusion that the Parties entered into a rent-to-own agreement for the Property, which was subsequently reduced to a writing. That written document remained in the possession of Mr. Shah and Ms. Yahya, and no copy was provided to the Debtor. Instead, a month-to-month lease was drafted nearly a year later, the Debtor's signature forged, and the

---

[41] Hearing Transcript, 188:2 to 188:4.

document given to the unwitting Debtor for submission to his school district.

The Court was persuaded by the Debtor's specific recollection of the circumstances surrounding the Parties' meeting in June 2019, during which time Mr. Shah collected a $5,000 deposit from the Debtor to be applied towards the down payment for the Property. The Debtor's testimony regarding this meeting and Mr. Shah's collection of the funds was detailed and credible, and leads the Court to conclude that as of June 2019, the Parties had made an oral rent-to-own agreement. Mr. Shah's explanation of this payment, by contrast, was not credible. The Court finds his explanation that he only collected $4,000, and did so as partial payment for the reduced judgment liability the Parties negotiated, not believable. It had been many years since the Debtor was found liable to Mr. Shah, and that liability was either discharged in the Debtor's prior bankruptcy, expired under applicable state law, or both. Mr. Shah was not asked and provided no explanation for why he allegedly waited so long to seek payment of the judgment liability, or why the Debtor would agree to pay it after the passage of so much time and its discharge in his bankruptcy.

The Court also found the Debtor's explanation of the $10,000 payment he made to Mr. Shah in February 2020 to be credible. The Court puts significant weight on the logic of the Debtor's explanation that the payment was to be added to the $5,000 paid in June 2019, for a total down payment of $15,000. The Court simply does not believe Mr. Shah's assertion that the $10,000 received was to function as a security deposit under a month-to-month lease, where the initial monthly rent was $3,500 and a security deposit of $10,000 would equal three months' rent. While it is true that the Debtor defaulted on his rent obligations during his prior tenancy of the Property, the term of the Motion Lease on which Mr. Shah relies was only month-to-month,

terminable upon failure to pay rent by the tenth day of the month.  As such, Mr. Shah would have already had significant protection from another default by the Debtor.  Moreover, the payment of $10,000 was a substantial sum of money for the Debtor, and he testified credibly that he never would have agreed to such a large security deposit if he only had a month-to-month lease.

Perhaps most importantly, the Court finds credible the Debtor's version of the events surrounding the Parties' signing of an agreement in April 2020 and the subsequent provision of a different agreement to the Debtor in March 2021.  The Debtor's testimony was clear.  He signed an agreement with Mr. Shah in April 2020 at Mr. Shah's home that provided for a five-year lease of the Property with an option to buy the Property at the end of the term for $540,000.  The initial monthly rent was to be $3,500, subject to a 5% annual increase, with $950 of the monthly rent to be applied to the purchase price.  He did not receive a copy of the agreement upon signing it because Mr. Shah and Ms. Yahya did not have a photocopier, and despite repeated requests he was unable to get a copy of the agreement.  Only in March 2021, when school police were at his door demanding proof of residence, was the Debtor given a document, which turned out to be the Alternate Lease.  The Debtor was adamant that neither the Motion Lease nor the Alternate Lease reflected the terms of his rent-to-own agreement with Mr. Shah, and that his signature was forged on both documents.

The clarity of the Debtor's testimony stands in contrast to the contradictions in Mr. Shah's and Ms. Yahya's version of events.  Mr. Shah first was steadfast in his assertion that he and the Debtor signed only one lease, but upon being shown the Alternate Lease, revised his testimony to say that the Debtor subsequently needed another copy of the lease for the school district, so the Parties executed another one.  The Court finds troubling Mr. Shah's initial failure

-29-

to remember or note that a second lease was allegedly executed, particularly because he only testified as such once shown the Alternate Lease and the clear differences between it and the Motion Lease.  Ms. Yahya's attempt to explain this discrepancy failed.  She testified that, contrary to her husband's testimony, two leases were executed in April 2020, both handwritten in the fillable blanks and therefore not appearing exactly the same.  However, her testimony that the Debtor was then given one of the executed leases in April 2020, and that she did not subsequently give him another copy to provide to the school district, contradicts both her husband's and the Debtor's testimony that the Debtor *did* need to return to Mr. Shah's home to obtain a copy for the school district.  Moreover, the Court finds the Debtor's version of the events in March 2021, including the school police visit, his conversation with Mr. Shah, his detour from his trucking route to obtain what he believed was the lease, his brief interaction with Ms. Yahya at her home, and his immediate submission of the document to the school district without reviewing it, to be detailed and credible, undermining Ms. Yahya's assertion that it never happened.

The Court notes that its assessment of Mr. Shah's and Ms. Yahya's credibility was significantly shaped by their testimony regarding the misspelling of the Debtor's name on both the Motion Lease and the Alternate Lease.  Both testified that the Debtor gave Ms. Yahya the misspelling of both his first and last names, and subsequently confirmed that misspelling when it was shown to him.  The Debtor testified not only that he never would have given Mr. Shah and Ms. Yahya a misspelling of his own name, but that he had known Mr. Shah for over 20 years, had previously leased from Mr. Shah, and Mr. Shah knew how to spell the Debtor's name.  The Court finds Mr. Shah's and Ms. Yahya's explanation of the misspelling not believable.  The

Debtor's seventh grade education may have presented other challenges for him, including not realizing that his rent after the first year had increased more than the 5% to which he had agreed, but the Court found nothing in the testimony to suggest that he does not know how to spell his own name and would not correct a misspelling of his own name.  Furthermore, the misspelling of the Debtor's name suggests to the Court that neither the Motion Lease nor the Alternate Lease were completed in the Debtor's presence or executed by the Debtor, giving credence to the Debtor's testimony that he had never seen either lease prior to the eviction proceedings being initiated and the Stay Relief Motion being filed.  Rather, the Court finds credible the Debtor's testimony that in April 2020 he signed a lease document that included a rent-to-own provision.

Finally, the Court finds persuasive the Debtor's testimony that Mr. Shah left responsibility for utilities and other Property-related costs to the Debtor.  Other than the homeowner association dues, Mr. Shah and Ms. Yahya did not dispute this, notwithstanding the fact that the Motion Lease on which they rely obligates Mr. Shah to pay the utilities, and nowhere does it provide that the Debtor would be responsible for property maintenance costs such as landscaping, tree removal, and replacing an air conditioner unit that had been at the Property long before the Debtor moved in.  The Court finds that Mr. Shah's passing of these costs to the Debtor is indicative of an acknowledgement that the Debtor's interest in the Property was more than a mere month-to-month tenant.

The Court acknowledges that not all evidence supports the Debtor's assertion of a rent-to-own.  In response to Mr. Shah's assertion that the Debtor paid him $4,000 in June 2019 as partial payment of the prior judgment liability, and the balance of $3,000 in March 2020, the Debtor acknowledged that he made a $3,000 payment to Mr. Shah, but could not recall why.

This is puzzling; a $3,000 payment is not an insignificant amount of money for most, and particularly for the Debtor. Moreover, the Debtor had a detailed recollection of other events related to the rent-to-own agreement and the Property, so his lack of memory with respect to why he paid Mr. Shah $3,000 in or about March 2020 gives the Court some level of pause. The Court is also not convinced by the Debtor's explanation as to why he failed to account for the rent-to-own agreement or his equity in the Property anywhere in his Initial Schedules. Although he may have been sincere in his belief that the rent-to-own did not need to be accounted for where he was not in default, his counsel would or should have known otherwise. Furthermore, the Debtor was in default of his payment obligations as of January 2022, and therefore even under the Debtor's logic, he should have amended his Initial Schedules to reflect the agreement. While not dispositive of the existence of the agreement, the Debtor's explanation does not satisfactorily answer why he did not account for it in his bankruptcy schedules until June 2022, after the Stay Relief Motion was filed.

On balance, however, the Court's assessment of the evidence and the testimony of the Debtor, Mr. Shah, and Ms. Yahya leads it to the conclusion that the Parties orally agreed in 2019 to a rent-to-own for the Property, which was then reduced to writing in April 2020. Mr. Shah and Ms. Yahya remained the sole custodians of that agreement, and a copy was never provided to the Debtor. He is therefore unable to produce one, and in that void Mr. Shah has attempted to assert the existence of a month-to-month lease instead. The evidence contradicts that assertion, and as discussed above, the Statute of Frauds is not to be used in furtherance of a fraud. The Court finds that the circumstances presented by the evidence at the Hearing warrant the conclusion that the rent-to-own agreement is excepted from the Statute of Frauds. The Court

further finds that Mr. Shah agreed to a rent-to-own agreement for the Property with the Debtor,

the material terms of which were a five-year lease for initial rent of $3,500, subject to 5% annual

increases, with $950 of the monthly rent to go towards the purchase price of $540,000.[42]

### 3.    Cause Does Not Exist to Grant Mr. Shah Relief from the Automatic Stay to Pursue Eviction Proceedings Against the Debtor

The Parties have an enforceable right-to-own agreement for the Property.  As such, Mr.

Shah may not proceed with an eviction proceeding against the Debtor based on his default under

and the termination of a purported month-to-month lease for the Property.  Moreover, the

evidence at the Hearing showed that the Debtor is or can become current on any lease payments

in default.  Finally, the Debtor has equity in the Property, and because the Debtor and his family

reside there, it remains necessary for the Debtor's successful reorganization.

## IV.    CONCLUSION

For the reasons discussed above, the Court finds that cause does not exist to grant Mr.

Shah relief from the automatic stay, and the Stay Relief Motion will be denied.  An order

consistent with this Memorandum will be issued.

Dated:  September 28, 2023

_____
MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE

---

[42] Mr. Shah presented Mr. Coppola's testimony regarding his estimate of the value of the Property to be between $800,000 and $850,000, presumably to argue that Mr. Shah never would have agreed to sell the Property to the Debtor for $540,000.  Mr. Coppola did not testify, however, as to the value of the Property in 2019, when the Parties made the agreement.  Moreover, apart from the Property's market value, it is possible Mr. Shah would have had other reasons for agreeing to sell the Property to the Debtor for $540,000.  There was no testimony or evidence to that effect, and the Court need not consider it further, because whatever his reasons may have been, the Court finds that Mr. Shah agreed to sell the Property in connection with the rent-to-own agreement for $540,000.

-33-

William B. Callahan, Esq.
Law Offices of William B. Callahan
P.O. Box 247
Gilbertsville, PA 19525

Michelle Lee, Esq.
Dilworth Paxson LLP
1500 Market Street, Suite 3500e
Philadelphia, PA 19102

Kenneth E. West, Esquire
Chapter 13 Standing Trustee
1234 Market Street, Suite 1813
Philadelphia, PA 19107

United States Trustee
Custom House
200 Chestnut Street, Suite 502
Philadelphia, PA 19106